UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**NANCY A. RAY**,  Case No. 6:15-cv-01051-KI

          Plaintiff,  OPINION AND ORDER

    v.

**CAROLYN W. COLVIN, Acting Commissioner of Social Security**,

          Defendant.

    Kathryn Tassinari
    Mark A. Manning
    Harder, Wells, Baron & Manning, P.C.
    474 Willamette, Suite 200
    Eugene, OR 97401

        Attorneys for Plaintiff

    Billy J. Williams
    United States Attorney
    District of Oregon
    Janice E. Hebert
    Assistant United States Attorney

Page 1 - OPINION AND ORDER

1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Jeffrey E. Staples
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff Nancy Ray brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Ray filed an application for SSI on February 21, 2012, and an application for DIB on March 13, 2012. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Ray, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on September 30, 2013.

On October 24, 2013, the ALJ issued a decision finding Ray was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on April 15, 2015.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform past work, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work in the national economy. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

Ray's severe impairments are: systemic lupus erythematosus with arthralgia, arthritis, neuropathy, Sjogren's syndrome, and asthma. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ concluded Ray could perform light work with lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for six hours in an eight-hour workday, and sitting six hours in an eight-hour workday. The ALJ thought Ray had the residual functional capacity ("RFC") to occasionally climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, crouch and crawl. She thought Ray should avoid exposure to extreme cold and extreme heat, concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas. She thought Ray would be absent no more than one day a month on a sustained basis.

Given this RFC, the ALJ concluded Ray could not perform her past relevant work, but could perform other work in the national economy such as dressing room attendant, soft goods sorting, and tray setter. As a result, Ray was not disabled under the terms of the Act.

## FACTS

At 46 years old on her alleged disability onset, Ray has work history as a caregiver in a group home. She was diagnosed with lupus in 1992. She stopped working sometime in 2007 or

Page 5 - OPINION AND ORDER

2008.  She completed the 11th grade.  Ray received medical care from Chemawa Indian Health Center during the relevant period, and mostly sought treatment for numbness in her fingertips, management of her asthma, management of her pain, smoking cessation, and routine gynecological care.  Tr. 298-344 (December 2007 through July 2011).  In September 2008, she was urged to contact vocational rehabilitation, but Ray was "resistant to the suggestion as feels 'There is no work I could do without using hands or feet.'"  Tr. 334.

In November 2011, she reported feeling more pain than normal, although she was walking three times a week.  She switched to Methadone from MS Contin (morphine), saying that the MS Contin was "not touching" her pain.  Tr. 295.  A month later she reported numbness in her hands, that the methadone did not make a difference, and that she "gets by fine on vicodin and ibuprofen, would prefer just to take those."  Tr. 288.  Her medications were refilled in March 2012, and she reported "doing ok."  Tr. 285.  In June 2012, she was interested in learning about her labs, she denied any new joint involvement, her gait was normal, and her doctor added tramadol for pain.  In September 2012, she reported "doing ok in general" although the tramadol did not help with her pain.  Tr. 386.  Her joints in her hands and wrists were not swollen and she had full range of motion in all her upper extremity joints.  She reported feeling 0/10 pain in November 2012, but 8/10 before taking Vicodin that morning.  She walked the dog for exercise.  Her doctor encouraged her to exercise.

Ray reported fatigue and weight-gain in February 2013, and her right heel was tender.  She was encouraged to get arch supports.  In June 2013, Ray had "no complaints" other than she could not lose weight.  She had started walking every day.

As a side-effect of her lupus, Ray occasionally experienced blurry vision. She first complained of blurriness in November 2009, and her doctor updated her glasses prescription. Similarly, in May 2010, her doctor found she needed new glasses to correct the blurriness. In June 2011, however, her doctor diagnosed her with inflammatory keratitis in her right eye and prescribed prednisone to address the irritation. Three days later, Ray reported "doing well now. No pain and vision back to normal[;] feeling good." Tr. 304. She remained stable in July, relapsed in August, but was "much better" in September 2011. Tr. 234. She continued "doing well" with use of prednisone in December, reporting that she was able to ignore any vision issues. Tr. 291, 231. In June 2012, having stopped prednisone use for about a month, she reported "doing well for most part" but felt some concerns about dry eye. Tr. 214. Her doctor recommended artificial tears. She continued showing signs of severe dry eye in December 2012; the doctor considered whether a cataract was developing due to prednisone use and he intended to monitor the cataract. He prescribed prednisone and rewetting drops.

## DISCUSSION

Ray challenges the ALJ's decision on three grounds: her analysis of Ray's credibility; her decision not to credit the opinion of Anthony Glassman, M.D.; and her rejection of the lay witness testimony offered in favor of Ray's claim.

I.   Ray's Credibility

Ray testified that she was diagnosed with lupus in 1992. She had applied for disability before, but did not appeal the denial upon legal advice that she wait until she turned 50 years old. She agreed some paperwork indicated she stopped working in December 2007 while another document indicated August 2008. She did not remember working in 2008, but she had earnings

that year. She testified she stopped working due to her lupus; specifically, she did not "feel safe driving [her clients] with my feet numb or lifting because I couldn't tell how hard of a grip I had on [her clients]." Tr. 41. She testified she did not look for other work because of numbness in her hands and feet. She had flare-ups–consisting of a rash and joint pain–three or four times a month, depending on the weather. When she had a flare-up she did not walk her dog and would not go fishing. She and her husband fished once a week, if she felt able. She testified she was taking morphine for pain relief twice a day, and Motrin in between. She had stopped taking Vicodin because it "wasn't touching my pain level anymore." Tr. 50. Her hands felt numb in the cold, and her feet felt numb if she stood for longer than 20 or 30 minutes. She was not using eye drops and she could read, but the vision in her right eye was still a little blurry.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based

Page 8 - OPINION AND ORDER

on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

The ALJ gave the following reasons for finding Ray's testimony about the extent of her impairments less than credible: (1) Ray reported in her application that she stopped working for "other reasons" rather than due to her impairments; (2) she gave several different dates for when she stopped working; (3) medical reports did not support the number of her alleged lupus flare-ups; and (4) medical records did not reflect the level of functional limitations she reported. These are all clear and convincing reasons to find Ray less than credible.

Ray offers an alternative interpretation of the evidence regarding her reasons for stopping work. On the disability application, Ray was asked when she stopped working and she wrote "02/01/2008" and then, in answer to the question why did you stop working, Ray answered "Because of other reasons." Tr. 170. She specified, "[P]roblems at work. They wanted me to do things that I did not feel I could do safely." *Id.* Then, in answer to the question, "Even though you stopped working for other reasons, when do you believe your condition(s) became severe enough to keep you from working?" Ray responded, "08/23/2009."

Ray argues her testimony is consistent with her other reporting–that she stopped working because she no longer felt she could perform her duties safely *as a result of her impairments*. Ray also contends the inconsistent dates are irrelevant. While Ray's interpretation of the

---

[1]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 2, n.2. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133,1136-37 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

evidence could be accepted, the combination of inconsistent statements about when she stopped working and when her onset date of disability began, and the fact that she did not directly state she stopped working because of her impairment, I find the ALJ's interpretation of the evidence is "supported by inferences reasonably drawn from the record[.]" *Molina*, 674 F.3d at 1112.

Ray also contends the ALJ cherry-picked the evidence, ignoring evidence which supported her claim. She insists her testimony is not inconsistent with the medical record. After reviewing the transcript, I simply disagree that the ALJ unfairly represented the contents of the medical record. In the vast majority of Ray's interactions with her providers, Ray reported her pain medications were controlling her pain, that she was doing "well overall," that she was doing "fairly well," that her pain levels were okay, that she was "doing ok" and her pain management was adequate, and that she denied new joint involvement. Tr. 337 (6/24/2008), Tr. 329 (4/20/2009), Tr. 323 (7/28/2009), Tr. 318 (1/25/2010), Tr. 311 (9/14/2010), Tr. 298 (7/15/2011), Tr. 282 (6/1/2012). The few months she complained of increased pain and the need for a different medication were the exception to Ray's overall stability. Tr. 295 (11/3/2011), Tr. 288 (12/16/2011). In fact, after taking the Methadone for a month, she reported it did not seem to make any difference and she "gets by fine on vicodin and ibuprofen, would prefer just to take those." Tr. 288.[2]

The ALJ gave clear and convincing reasons, supported by substantial evidence in the record, to find Ray's testimony about the extent of her impairments less than credible.

---

[2]In her assessment of Dr. Glassman's opinion, the ALJ also commented that Ray told Dr. Glassman pain interfered "100%" with her activities, sleep, and enjoyment of life, which was inconsistent with her testimony that she could engage in activities of daily living when she was not experiencing joint flares. Tr. 16. This inconsistency is only further support for the ALJ's assessment of Ray's credibility.

Page 10 - OPINION AND ORDER

II.        <u>Medical Evidence</u>

Ray argues the ALJ failed to give specific and legitimate reasons to discount the opinion of Dr. Glassman.  The ALJ found she could not give any weight to Dr. Glassman's opinion because he completed a functional assessment that was inconsistent with the limitations he opined in his report, and because the limitations he gave were not supported by objective evidence.

Dr. Glassman examined Ray in July 2013.  In his report, he indicated that Ray complained of joint pain in her upper and lower extremitites and hips.  She described a photosensitive rash on her face, arms, torso and legs, and chronic dry eyes and put her average pain as 5/10.  She noted only 20% pain relief from medications and that pain interfered with her activities all of the time.  Dr. Glassman observed no functional pain behavior.  Ray could sit, stand, turn and dress without difficulty.  She could heel walk and toe walk without difficulty, could partially rise from a squatting position, and had mild difficulty with tandem gait.  The doctor thought Ray "certainly capable" of working a light duty job.  Tr. 373.  He also thought "[d]ue to the symptoms of her lupus it is probably unrealistic to expect her to work on a daily basis as one would expect absenteeism during flareups."  *Id.*  He thought standing would be limited to no more than 3 and a half hours, but sitting was unrestricted.

Dr. Glassman also completed a check-the-box functional report in which he limited Ray to sitting four hours at one time without interruption, for a total of five hours, and standing and walking for one hour at a time for a total of three hours.  He gave reaching, handling and fingering, feeling, and pushing/pulling limitations.  He thought she could "never" climb stairs,

ladders, balance, stoop, kneel, crouch and crawl. Tr. 364. He also imposed environmental limitations.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Ray concedes that Dr. Glassman's two submissions conflicted with each other in some ways, but she argues he was consistent about the walking and standing limitation. In addition, she argues, if the functional capacity form contained limitations that conflicted to such a degree so as to be nonsensical–as the Commissioner argues–then the ALJ had a duty to investigate and resolve the ambiguity.

A Social Security ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation omitted). The ALJ must supplement the record if: (1)

there is ambiguous evidence; (2) the ALJ finds that the record is inadequate; or (3) the ALJ relies on an expert's conclusion that the evidence is ambiguous. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). The supplementation can include subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow the record to be supplemented. *Tonapetyan*, 242 F.3d at 1150.

I agree with the Commissioner that the ALJ was not required to investigate and resolve the conflicts in Dr. Glassman's opinions. The ALJ is permitted to decide what evidence is reliable and base her decision on that evidence; here the contradictions the ALJ identified in Dr. Glassman's opinion went to the reliability of his findings, rather than indicating any ambiguity about Ray's functioning. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ need not accept opinion that is "conclusory, brief, and unsupported by the record as a whole" or by "objective medical findings"). Further, the record was otherwise more than adequate to support the ALJ's finding that Ray was not as limited as Dr. Glassman reported.

Relatedly, then, the ALJ's second reason–that Dr. Glassman's opinion was unsupported by the objective evidence–was specific and legitimate and supported by substantial evidence. The conclusions the doctor came to in his physical examination did not support the assessment he completed. Additionally, as I discussed above in the context of Ray's testimony, the medical evidence contradicts the level of limitation opined by Dr. Glassman. Again, although Ray contends the ALJ highlighted only those medical records indicating improvement or stability,[3]

---

[3]For example, Ray points to a note made by her eye doctor of constant pain and occasional flare-ups on 7/18/2011, but just two weeks earlier she reported to her physician that her pain management was adequate with opiates/NSAIDS. *Cf.* Tr. 242 *with* Tr. 298. Further, although Ray that Tramadol did not help with the pain, she also informed her doctor she was
(continued...)

the ALJ's summary was an accurate representation of Ray's symptoms and treatment. The ALJ did not err in rejecting Dr. Glassman's opinion.

III.     Lay Testimony

Ray's husband completed a Third Party Function Report in which he relayed Ray did not get much sleep, her short term memory was poor, her feet and hands would go numb, and her vision was blurry. He conceded she cooked for him and drove for him, took care of the pets, did the dishes, laundry, went grocery shopping, and could crochet when her hands were not numb. He thought Ray could lift 10 pounds, but she dropped things, and that she could stand, walk and sit for short periods. The ALJ commented that David Ray's observations were "largely consistent with those of the claimant." Tr. 15. She accepted those observations, but felt that the behavior he observed was not consistent with an inability to work.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006).

As Ray points out, there is no support for the ALJ's statement that David Ray's observations were not consistent with an inability to work. To the contrary, while the ALJ found Ray could stand and walk six hours in an eight-hour day, David Ray observed that Ray could stand and walk for short periods of time. Similarly, the ALJ identified no limitations in reaching or handling, but David Ray thought Ray dropped things on occasion.

---

[3](...continued)
"doing ok in general" and she reported 0/10 pain with Vicodin two months later. Tr. 386, 384.

The Commissioner contends the ALJ simply accepted the agency consultants' medical opinions over those of the lay witness, making any error harmless. Ray disputes that medical opinion can be the basis to reject lay witness testimony, especially where an agency doctor opinion will always find a claimant able to work in every case litigated in court. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (lay witness testimony cannot be rejected because not supported by, or corroborated by, medical evidence in the record). Since the ALJ did not actually make the finding the Commissioner urges, I do not address it.

Instead, as the ALJ did note, David Ray's testimony was essentially the same as Ray's testimony. It is acceptable to reject a spouse's testimony for the same reasons given for the claimant if the spouse's testimony is similar to the claimant's complaints. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). The ALJ gave clear and convincing reasons for rejecting Ray's testimony, rendering harmless any error the ALJ made in addressing David Ray's report. *Molina*, 674 F.3d at 1122 (error may be harmless where failure to provide germane reasons for rejecting lay testimony did not alter the nondisability determination).

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this 15th day of July, 2016.

   /s/ Garr M. King
Garr M. King
United States District Judge